## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**BELEN A. HOLBROOK, individually,**
**as Next Friend of ALYSSA**
**HOLBROOK, a minor, and as**
**personal representative for**
**Wrongful Death claims.**

     **Plaintiffs,**

**v.**                                **Case No. _____**

**THE UNITED STATES of AMERICA,**
**dba THE UNITED STATES AIR FORCE**
**and JOHN DOES 1 & 2;**

     **Defendants.**

### COMPLAINT FOR WRONGFUL DEATH AND LOSS OF CONSORTIUM

Plaintiff BELEN HOLBROOK, individually, as next friend of Alyssa Holbrook, and as personal representative for the Wrongful Death Claims under the NM Wrongful Death Act, through counsel, McGinn, Montoya, Love & Curry, P.A., hereby files suit against THE UNITED STATES OF AMERICA, dba THE UNITED STATES AIR FORCE ("USAF"), and states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Decedent Charles Holbrook was killed on January 31, 2017 at the White Sands Missile Range, near Holloman Air Force Base, in Otero County, New Mexico.

2.      Mr. Holbrook's surviving spouse, Belen Holbrook, is a resident of Santa Rosa County, Florida and the mother of Alyssa Holbrook.

3.      Alyssa Holbrook, a 14 year old minor child and the surviving daughter of Charles Holbrook, is a resident of Santa Rosa County, Florida.

4.      Belen Holbrook has been appointed personal representative for the wrongful death claims arising from the death of Charles Holbrook, pursuant to the New Mexico Wrongful Death Act, NMSA 41-4-2, et. seq., representing the rights and claims of the statutory beneficiaries, Belen and Alyssa Holbrook.

5.      Belen Holbrook was appointed personal representative of the estate of Charles Holbrook under the laws of State of Florida on March 24, 2017.

6.      Defendant the United States of America (USA) was doing business in the case through the United States Air Force (USAF), with the principal place of business for that branch of the military at 1670 Air Force Pentagon, Washington, DC 20330-1670.

7.      John Doe I was the Mishap Instructor Pilot ("MIP" or "instructor pilot") involved in the shooting of Charles Holbrook.  At all times pertinent hereto, he was acting in the course and scope of his employment with the USAF and Defendant USA.

8.      John Doe II was the Mishap Pilot ("MP" or "student pilot") involved in the shooting of Charles Holbrook.   At all times pertinent hereto, he was acting in the course and scope of his employment with the USAF and Defendant USA.

9.      Defendant USA through the USAF was responsible for the acts and omissions of their employees, agents, apparent agents, and contractors, including Defendant John Does I and II, the JTAC personnel and those USAF members responsible for training, supervising, directing and ensuring safety in the live fire nighttime run, pursuant to the doctrines of agency and/or *respondeat superior*.

10.     The cause of action arose in New Mexico.

11.     Pursuant to 28 USC § 2679(b), the United States dba through its military branch, the United States Air Force, is a proper defendant.

12.     Plaintiff has satisfied the jurisdictional prerequisites for federal jurisdiction under 28 U.S.C. §§ 1332 & 1346 because the amount in controversy exceeds $75,000 and the defendant is the United States.

13.     Pursuant to 28 USC §§ 1346(b) & 1402(b), the United States District Court for the District of New Mexico has jurisdiction over this cause of action and is the appropriate venue for this matter.

14.     Pursuant to 28 U.S.C. §2675(a), Plaintiff timely presented this claim to the United States Air Force on December 27, 2018, which tolled the three-year statute of limitations on Plaintiff's claims under 28 U.S.C. § 2401(b) and New Mexico law.

15.     USAF did not make a final disposition of the claim within six months and has still not made a final determination, thus, pursuant to 28 USC § 2675(a), Plaintiff may proceed in federal court.

## STATEMENT OF FACTS

16.      When the United States through its USAF makes the decision to allow non-military civilians at live fire nighttime training for F-16 pilots, the USAF must ensure the safety of those civilians by, among other safety measures:

   a.  Keeping the civilians far enough away from the live fire area so they cannot become a target;

   b.  Having safety policies, procedures and protocols that prevent innocent civilians from mistakenly becoming targets;

   c.  Ensuring that the target for a live fire exercise does not look the same as the area where civilian personnel are staging for observation;

    d.   Requiring adequate safety training of all those involved, particularly where there are disparate groups of personnel who have not worked together or have never been involved in this kind of nighttime live fire exercise;

    e.   Requiring those involved in the live fire exercise to come up with a safe plan for communications and the order to fire;

    f.   Requiring those involved to follow the pre-exercise safety plan;

    g.   Requiring that a live fire mission be slowed down or stopped if:

        i.   There are any red flags suggesting the pilot may have the wrong target;

        ii.   There is confusion or miscommunication in the air or on the ground; or

        iii.   The firing pilot is not sure he has the right target.

    h.   Requiring personnel to ensure that all those involved have the appropriate safety equipment.

17.    During a nighttime training flight for two student F-16 pilots using live ammunition on January 31, 2017 at White Sands Missile Range, the USAF did not keep civilian contractor Charles Holbrook safe from being hit during a strafing run.

18.    Charles Holbrook was killed when an F-16 student pilot mistook the line of rental cars for the similarly aligned target and was ordered to fire at the group, blowing up one of the rental cars and striking Charles Holbrook in the head with a 20mm round.  Mr. Holbrook died several hours later at the hospital.

## January 30-31, 2017

19.    Charles (Chuck) Holbrook, a business development manager at Sensors Unlimited, a division of United Technologies Aerospace Division, came to New Mexico to demonstrate a laser imaging device to members of the Dutch Air Force.

20.    The USAF invited Mr. Holbrook to perform this demonstration during a nighttime training exercise for two rookie F-16 pilots scheduled at White Sands Missile Range near

4

Holloman Air Force Base in Alamogordo, New Mexico.   This would be the first time the young pilots performed a nighttime live fire exercise.

21.     On January 30, 2017, there was a short safety briefing for the disparate group of individuals who would participate in a nighttime close air support scenario where F-16 fighter jets would attack with live ammunition an enemy position when "friendlies" were nearby. There were four jets in the air - 2 instructors and 2 student pilots, each in their own F-16 - and 10 individuals on the ground, some who were training to direct air-support fire.  These groups had never worked together before.

22.     The four pilots were grouped into pairs, called "flights," *Biggie flight* and *Bolt flight*. Each flight had an instructor in one aircraft and a student in the other. The student pilot who killed Mr. Holbrook had the call sign "Biggy 42" or "Biggy 2". He is also known as the **"Mishap Pilot" (MP)**.

23.     At the direction of his flight instructor, this was the MP's first night close air support mission, first use of night vision goggles while piloting the aircraft, and the first time he would be performing a nighttime high-angle strafe of unlit targets.

24.     The MP's flight instructor had the call sign "Biggy 41" or "Biggy 1". He is also referred to as the **"Mishap Instructor Pilot" (MIP)**.

25.     The other pair of pilots went by the call signs "Bolt 31" (or "Bolt 1") and "Bolt 32" (or "Bolt 2").

26.     The individuals on the ground included 4 Air Force "Joint Terminal Attack Controllers" (JTACs) from two different units – the Idaho National Guard 124th ASOS (Air Support Operations Squadron) and Fort Bliss, Texas 7th ASOS.   These JTACs had never worked together or with the USAF personnel from Holloman on a nighttime mission.

5

27.     A JTAC's job is to identify targets on the ground for the aircraft and to **control the authorization** for a particular aircraft to attack a particular target.[1] One of the JTACs was inexperienced and still in training.

28.     The remaining persons on the ground were two Army Ground Liaison Officers; three JTACS from the Dutch Air Force to observe Mr. Holbrook's laser imaging device; and **Civilian contractor Charles Holbrook.**

**<u>Inadequate Planning Sessions</u>**

29.     There are no accidents, only poor planning. Upon information and belief, no members of the ground crew were present at the pilots' mission briefing, where the MIP presented the training scenario.

30.     The ground crew met at Holloman Air Force Base for a superficial and short safety briefing on or about the date of the mission; an insufficient amount of preparation for what was a complicated night mission involving unrelated participants, most of whom had never worked together.

31.     At the end of the safety briefing, Charles Holbrook was not provided with any safety equipment, such as a helmet or flak jacket, to wear during the exercise, or was not provided with safety equipment that fit him.

32.     As designed by the MIP, the training run for the student pilot (MP) was to test his ability to hit the right target in the dark, at low altitude, when there were real "friendlies" nearby and simulated "friendlies" that would move about the training area.

33.     The other instructor pilot, for *Bolt flight*, a major and eleven-year veteran of the Air Force, felt that this training run was unusually complicated. It would be the first time in his

---

[1] *I.e.,* the decision to release ordinance toward a target, also known as "terminal control."

three years as an instructor at Holloman AFB that they would run this nighttime close air support mission with two flights of two jets each; normally, there would only be two jets in the air, not four.

34.     The MIP's confusing explanation of the training run left the *Bolt flight* instructor and *Bolt flight* student unsure of whether there were actually any *simulated* friendlies, or whether all friendlies in the scenario would be real people, and if so, where exactly the real people would be stationed, whether at the observation post (OP) or at one or more "contact points" in the field.

35.     Upon information and belief, the real friendlies, the observers and ground crew, were deliberately placed less than half a mile away from the intended training target.

36.     The intended training target was a line of vehicles on a dirt circle, with a road going north of the circle.

37.     The observers and civilian Charles Holbrook were placed less than a half mile away from the target in an almost identical configuration as the target – a line of rental vehicles on a dirt circle with a road going north of the circle.

38.     At night, in the dark, these two targets would look the same.  It is unknown whether the men on the ground, including Chuck Holbrook, were warned that they were serving as a potential "friendly" target for the two student pilots and were at risk of being hit by live fire from the extremely dangerous F-16 fighter jets.

39.     The people on the ground may have been lulled into a false sense of security because the plan laid out at the safety meeting was that the **decision to fire** would be made **only by the JTACs** on the ground, who were right there with them in the circle. The JTACs would be tracking the student pilots to ensure they were on the right target and not over the wrong group on the ground.

40.     The plan given to the JTACs by the MIP did **not** indicate that control would be passed **between the JTACs and the MIP**.

41.     JTACs use strict guidelines to control a particular jet, or to pass control of that jet to another JTAC, so everyone involved in an attack, including the pilot, knows who is responsible for a release of ordinance on a target.

42.     According to the plan received by the JTACs, the member of the 124th ASOS from Idaho National Guard (known as "Mishap JTAC Instructor One" or "MJI1") was to control the first two target runs, then pass control to "Mishap JTAC One" or "MJ1" (a trainee seeking qualification to even *begin* JTAC training), who would be supervised by a *different* individual, "Mishap JTAC Instructor Two" ("MJI2," from the 7th ASOS from Fort Bliss), and then MJ1 would pass control to one of the Dutch JTACs ("DJ1") for the rest of the mission.

43.     Before the training attack, the MIP never told those on the ground that he might take control from the JTACs and instruct the MP to fire on a target.

44.     Although a properly trained pilot can serve in the role of JTAC from his jet as a "Forward Air Controller (Airborne)," the MIP would not have the same kind of tracking as those on the ground, and a sudden switch in control of the decision to fire would cause confusion.

45.     Additionally, the MIP would have to split his concentration between providing instruction to the MP and providing in-air terminal attack control to the other jets in the air.

46.     A Lieutenant Colonel and Squadron Commander of a different squadron at Holloman AFB later said that he would never allow one of his pilots to act as a forward air controller and student instructor at the same time.

47.     This was the MP's first night close air support mission and the first time he would be performing a nighttime high-angle strafe of unlit targets.

48.     The MP still needed low altitude night vision goggle training, which was supposed to be undertaken with an instructor **in the cockpit with** the MP.

49.     Instead, the MIP decided to quickly run through low altitude night vision google training with the MP alone in his jet, immediately before the start of the complicated close air support mission.

50.     Despite the fact that this mission involved inexperienced student pilots, one inexperienced JTAC, participants who had not worked together before, switching control of the decision to fire between unfamiliar parties, and the extreme danger of live fire from an F-16, the safety briefing and mission briefings were rushed and lacked concrete rules of engagement, resulting in confusion in the field.

**The Shooting of Chuck Holbrook**

51.     The two F-16s of *Biggy flight*, arrived at the Red Rio bombing range at White Sands Missile Range at 6:21 pm and began the training mission.

52.     The target was a line of vehicles parked on a cleared dirt oval with a road running North from the top of the oval

53.     The ground crew was placed less than half a mile away at an observation post overlooking the bombing range.

54.     The location of the ground crew was a cleared dirt oval with a road running North from the top of the oval. The ground crew parked its rental vehicles in a line within the oval.

55.     From the air, at night, the observation point for the ground crew looked the same as the target.

56.     *Biggie flight* began the mission by releasing *simulated* guided bombs on enemy targets at the direction of MJI1. Then the MP practiced evasive maneuvers responding to a simulated surface-to-air missile launch.

57.     MJI1 passed terminal control to MJ1 at some point without incident. *Biggy flight* performed bombing runs, some simulated, some dropping real, inert bombs on a number of targets until about 7:00 pm.

58.     At 6:59 pm, **MJ1 set up a red strobing infrared (IR) beacon at the observation post (OP), this would distinguish the observation point from the surrounding area and from any targets because it would display a visual flash in the pilots' night vision goggles**.

59.     When the MJ1 stated that he had set up a strobe at the observation point, the MIP confirmed that he saw the strobe.

60.     The MP never indicated that he had located the strobe and thus the real people on the ground.

61.     This should have set off alarm bells for the MIP and he should have asked why the MP did not announce that he saw the strobing OP or otherwise verified that the MP saw and understood that the IR strobe indicated the observation post.

62.     Around this same time, the second pair of F-16s, *Bolt flight*, arrived at the bombing range and the MIP and JTACs needed to coordinate a busier airspace.

63.     *Bolt flight* checked in with the JTACs and MIP and asked for a situation update.

64.     Neither the MIP nor the JTACs provided a situation update.

65.     Instead, the MIP immediately directed *Bolt flight* to drop their bombs on targets. *Bolt 31*, the second student pilot, later stated that this was when "things began to feel rushed."

**First Mis-Targeting of the People on the Ground at the Observation Post**:

66.     Contrary to the original plan, the MIP took control from MJ1 over the two jets in *Bolt flight* for their bombing attack on the target (the so-called "SA-8 target area"), less than 900 meters southeast of the OP.

67.     At the same time, the MIP asked MJ1 to control the MIP's own designated student, the MP, for a high-angle strafe attack on the same target, SA-8.

68.     For this run, the MP mistakenly moved the targeting pod sensor in his jet and was "tracking" (i.e. targeting) the ten people on the ground at the OP.

69.     At 7:07 pm, the MP called out "capture target," ostensibly indicating that he was tracking the intended target 900 meters southeast of the OP, but the MP never described what he was targeting, and the MIP never asked him to describe or verify that the MP was tracking the correct target, rather than the OP.

70.     The MIP could have activated a link between his jet and the MP's targeting pod, so the MIP could see what the MP was targeting, but the MIP chose not to do so.

71.     Evidencing the confusion going on in the air, before the MP could perform his strafe on what everyone thought would be SA-8—but would have *actually* been the OP—the MIP ordered the MP to abort his strafing run so the MIP could instead direct *Bolt flight's* terminal attack on the same target, SA-8.

72.     While *Bolt flight* was being directed to SA-8, the MP reset his targeting pod cursor, which switched his tracker to the appropriate SA-8 target. For some reason, this switch never alerted the MP or the MIP that the previously selected target may have been in error, or should have at least warranted closer attention.

**First Red Flag Warning - Strafe 1 - 7:10 pm**:

73.     The MIP then transferred control of MP back to MJ1 for his strafe run on target SA-8. At this point, the MP's targeting pod was working correctly to track the correct target and his steering information was showing him how to steer onto the correct target, SA-8.

74.     MP called out the flight heading that would have placed him on target (35 degrees clockwise from magnetic north) but he *actually* flew a different heading that pointed him back to his original *incorrect* target – the OP (19 degrees from magnetic north). He had to ignore his targeting pod and steering information to perform this maneuver. This shows the student MP was not able to either follow or understand his flight data and instrumentation.

75.     After pointing his aircraft at the people on the ground at the OP, he squeezed the trigger to fire his 20mm Vulcan cannon on the OP.

76.     No rounds were released during this mis-targeting, because the MP had inadvertently left his master armament switch in simulation mode, so nothing happened, and he flew over the top of the OP.

77.     For this aborted strafe attempt, the MIP was "sparkling and lasing" the correct target; he was pointing his infrared (IR) designator at the correct target (this is visible as a bright, "sparkling" line in night vision goggles) and the MIP's targeting pod laser was pointing at the target ("lasing" the target).

78.     The targeting laser was not visible in night vision goggles, but the MP's targeting pod was calibrated to detect and identify the MIP's targeting laser and indicated this correctly on the MP's display.[2]

---

[2] The USAF was using its own equipment to "sparkle" and identify the correct target with lasers and was not using or relying upon the device that Mr. Holbrook was demonstrating to the Dutch Air Force.

79.     Despite the fact that his instruments showed he was on the incorrect target, a target that was not lased or sparkled, but had a red warning strobe light, after his failed attempt to hit the wrong target, neither the MP or his instructor realized his mistake.

80.     One of the people on the ground, MJI1, was concerned when the MP flew directly over the OP (the OP he had almost destroyed with 20mm cannon rounds). MJI1 described how this concerned him:

> And then there was one point that an aircraft, one of the F-16s aborted themselves on a target. And I don't remember what call sign it was, or if he was lead or trail. But I do remember I was looking for them and I think I saw an aircraft that was kind of pointed at us, that his sparkle was, like, over the top of our heads a little bit when the target was way south. And I was, like, that was weird. And then I heard he aborted himself, and then I kind of got just a weird feeling, the hair on the back of the neck.

81.     This error was a red flag warning and an opportunity for the MIP and MJ1 to slow down and reassess the situation. Had they done so, they would have realized that MP attempted to fire on the wrong target.

82.     The MIP should have checked in with his student and verified that he had identified and was firing on the correct target, and whether he could safely continue training such a complicated scenario.

83.     Instead, the MIP chewed out the MP for having his master armament switch in simulation mode and, even though MJ1 was supposed to be tracking and giving the order to re-attack or fire, the MIP immediately ordered the MP to re-engage target SA-8.

84.     On commands from his instructor, the MP changed the switch from simulation mode to arm mode and turned around to take another run.

**Second Red Flag Warning - Strafe 2 - 7:13 pm**:

85.    The MP pulled around for another pass at SA-8 from a roughly northeast direction. His steering information, a steer point "diamond" in his heads-up display, was directing him to the correct target and the MIP was sparkling the correct target with his IR pointer.

86.    This time, as the MP approached the correct target, he aborted and did not squeeze the trigger. The MIP asked him why he aborted. The MP said, "The sparkle just looked different so I did not want to shoot, I wasn't uhh, it wasn't as circular as I thought I saw, it looked like a light maybe on top of a building, I was wrong."

87.    The MP was describing the red strobe light above the small structure at the Observation Post, where the people on the ground were located.

88.    His description is spot on for the OP, which had a light on top of a building and is slightly more oblong than SA-8 (the real target).

89.    The real target at SA-8 had no lights.

90.    Even the possibility that the MP could have been describing the OP at *any point* during this exercise should have been enough warning for the MIP or the JTACs on the ground. The MIP or the JTAC should have slowed or shut down the training session until he could be sure the MP clearly understood the proper target.

91.    The MIP did not respond to the MP's description and explanation or provide any input or instruction to ensure his student pilot was on the correct target.

92.    This exchange happened over the private radio between the MIP and MP, so MJ1 (the person who was supposed to be directing the student pilot from the ground) did not hear it.

93.    When MJl asked over the primary radio for the reason the MP did not fire, the MIP, and not the MP, responded dismissively that the MP was going to setup for a re-attack.

94.     The MIP did not actually answer the MJ1's question and the MJ1 did not further seek to understand what had gone wrong.

95.     None of the ground crew were ever told of MP's alarming description. None of them were aware that they had now been targeted twice, described as the target by the MP, and were in extreme danger. Nor were they told that the MIP had again taken control over the JTAC crew on the ground and ordered the MP to fire on their location.

**Fatal Strafe 3, 7:18 pm**:

96.     On the MP's final deadly strafe, the MIP began using the call sign of a JTAC who did not have control of the MP. The MIP apparently believed that control had been transferred to this JTAC when it had not, evidencing even more confusion and even more reason for the parties to slow down or stop the exercise because the participants were miscommunicating.

97.     The MIP announced to the wrong JTAC that the MP only had five minutes remaining to complete this training mission – indicating he was rushing the MP to complete his strafe.

98.     There was no response from the ground regarding the MIP's erroneous use of the JTAC call sign.

99.     The MIP again pointed his targeting pod laser at the SA-8 target and the MP's targeting pod accurately tracked the correct target using the MIP's laser. As a result, in the MP's heads-up display, a marker was placed over the correct target (this was in addition to the steering point diamond also indicating the correct target).

100.     The MP called out that he was tracking SA-8 with his targeting pod but provided no description of what the MP was actually seeing, and the MIP did not verify what his student was seeing.

101.    The MIP requested from the wrong JTAC—one of the Dutch JTACs instead of MJ1—control over the MP's terminal attack.

102.    Despite no response from the ground crew granting MIP's request for control, MIP took control and cleared the MP to fire on the target.

103.    As the MP set-up for his strafing run, he performed a roll in toward SA-8 causing his targeting pod to perform a "gimbal roll," a normal operation when the targeting pod can no longer maintain focus or "stare" at a target because the targeting pod can only turn so far in one direction before it reaches its rotational limit and needs to momentarily reset. This causes the laser-tracking reticle to move around on the heads-up display.

104.    As soon as he straightened out his roll, the targeting pod reacquired the correct SA-8 target.

105.    Despite the plane re-acquiring the correct target, the MP maneuvered the aircraft to the left, away from SA-8 and back toward the Observation Post he had been mistakenly targeting on his two previous runs.

106.    When the MP turned on the air-to-ground strafe mode and a strafing reticle appeared in his heads-up display, there was no target information to aim at in the heads-up display, because the target was off to the right. The MP either did not recognize or misinterpreted the significant information in his heads-up display, i.e., that the steer point diamond and laser targeting reticle were absent from his display.

107.    After receiving the okay from the MIP, the MP squeezed the trigger while the nose of the aircraft was pointed at the OP and sent 155 rounds of Vulcan cannon ammunition toward the ground crew, blowing up a rental car and striking Chuck Holbrook in the head with a 20mm round.

108.     Chuck Holbrook died about one and a half hours later at Gerald Champion Regional Medical Center in Alamogordo.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENT HIRING, TRAINING AND SUPERVISION OF JOHN DOE I MISHAP INSTRUCTOR PILOT, JOHN DOE II MISHAP PILOT and JTAC GROUND CREW

All previous paragraphs are incorporated herein by reference.

109.     Defendant USA through the USAF was responsible to only hire and train individuals with the capacity to safely carry out the duties and tasks of pilot instructors, pilots and ground crew within the USAF.

110.     Defendant USA through the USAF was responsible to ensure that its pilot instructors, pilots and ground crews received the necessary training to safely carry out the duties and functions required in the USAF, including to avoid unnecessarily causing harm to civilians.

111.     Defendant USA through the USAF was responsible to supervise all pilot instructors, pilots and ground crew to ensure proper performance of their duties and roles for the USAF such that they do not contribute to cause unnecessary harm to civilians.

112.     Defendant USAF had a duty to train and supervise all USAF pilot instructors, including Defendant John Doe I Instructor Pilot, in the *planning* of flight training missions to ensure that training missions:

        a.      Are appropriate for the student pilot's skill level and abilities;

        b.      Involve no more aircraft or air traffic than is necessary to train the student pilot and are appropriate for the instructor pilot's skill level and abilities and the ground crew;

        c.      Are not overly complicated in scope, target location, or attack control elements;

17

       d.      All components of the training mission are within the skill level of the instructor pilot(s) and the student pilot(s) who participate in the mission;

       e.      Are slowed down or halted if there is any question that a pilot may have the wrong target; and

       f.      Do not unnecessarily endanger others.

113.    Additionally, Defendant USAF has a duty to train and supervise all USAF instructor pilots, including Defendant John Doe I Instructor Pilot, in *conducting* flight training missions to:

       a.      Properly plan and operate flight training missions;

       b.      Protect civilians on the ground;

       c.      Adequately supervise and instruct student pilots during training missions;

       d.      Monitor performance of student pilots during training missions;

       e.      Properly prioritize the instructor's attention during training missions;

       f.      Listen to the radio transmissions of his student for signs that he may have the wrong target;

       g.      Avoid overconfidence, complacency, and over-aggressiveness during training missions;

       h.      Monitor student pilots during training missions to ensure proper target identification;

       i.      Respect terminal attack control procedures and not clear a student pilot's final strafing attack without proper terminal attack control; and

       j.      Not allow student pilots to fire on the wrong target.

114.    The USAF was responsible for ensuring that the pilots involved in live fire exercises were adequately hired, trained and supervised to, among other things:

       a.    Correctly identify ground targets;

    b.   Correctly confirm that the pilot's perceived target is the proper target upon which the pilot is authorized to fire; and

    c.   Read, interpret, understand and utilize on-board systems and instruments relating to target identification, confirmation, and firing of ordinance; and

    d.   Not fire on the wrong target and endanger civilian lives.

115.    The USAF was responsible for ensuring that the JTAC ground crew involved in live fire exercises were adequately hired, trained and supervised to, among other things:

    a.   Protect civilian lives;

    b.   Correctly identify ground targets;

    c.   Correctly confirm that the pilot's perceived target was the proper target before authorizing a pilot to fire;

    d.   Understand the safety plan for the live fire exercise and make sure that safety plan is followed;

    e.   Slow down or immediately halt the exercise if there is confusion, misunderstanding or any chance that the student pilot has the wrong target; and

    f.   Make sure the student pilot does not fire at civilians.

116.    Despite these duties, Defendant USA through the USAF did not use ordinary and proper care when it hired, trained and supervised its pilot instructors, including Defendant John Doe I; its pilots, including Defendant John Doe II Mishap Pilot; or its JTAC ground crew, causing the death of Charles Holbrook.

117.    It was foreseeable that these reckless and negligent acts and omissions by the USAF, through its agents or employees, would result in the wrongful death of Charles Holbrook, and loss of consortium suffered by Plaintiffs.

118.    The USAF's reckless and negligent acts and omissions in the hiring, training and supervision of its pilot instructor, pilot and ground crew contributed to cause the wrongful death of Charles Holbrook, and loss of consortium suffered by Plaintiffs.

119.    Under the New Mexico Wrongful Death Act, the damages for wrongful death caused by the Defendant include lost wages/earning capacity; medical bills; lost household services; lost value of life, pain and suffering and aggravating circumstances.

## COUNT II

### NEGLIGENCE RESULTING IN WRONGFUL DEATH

All previous paragraphs are incorporated herein by reference.

120.    Defendant USA through the USAF, acting through its agents and employees, including John Does I and II, was responsible for the safety of civilians it invited into a live-fire bombing area.

121.    Specifically, Defendant, through its agents and employees in the USAF, breached its duty of care when it:

    a.  Placed Charles Holbrook and the JTAC team less than half a mile away from the target;

    b.  Allowed Charles Holbrook and the JTAC team to line up their vehicles on a cleared dirt oval with a road on the north end, in a manner and area that looked similar to the intended target, a dirt oval with a road on the north end;

    c.  Did not warn Charles Holbrook that the intent of the mission was for the pilot to try and distinguish between the target and "friendlies" nearby, thereby putting Mr. Holbrook at risk;

    d.  Allowed the instructor pilot to, without proper oversight, design and attempt to execute a nighttime live fire training mission that was too advanced and/or complicated for his student pilot and others participating in the mission;

    e.  Did not follow safety protocol requiring that a student pilot should not fire live ammunition if he is not sure he has the right target;

f.  Did not follow safety protocol that an instructor pilot should not allow or, worse, exhort his student pilot to fire live ammunition if the instructor pilot is not sure the student pilot has the right target;

g.  Ignored two red flag warnings from the first two unsuccessful strafing runs, that indicated the student pilot was incorrectly targeting the ground crew and civilian Charles Holbrook rather than the target;

h.  Did not slow down or halt the training mission when things began to go wrong;

i.  Did not adequately prepare the disparate groups of air and ground crews coming together for this dangerous and complicated live fire exercise;

j.  Did not follow the communication plan for who was to give the order to fire on the target; and

k.  Did not ensure civilian Charles Holbrook had the appropriate safety equipment, including a helmet and flak jacket.

122.   Despite these duties, the Defendants violated their duty to use ordinary and proper care when Charles Holbrook was wrongfully targeted and shot by an F-16, causing his wrongful death and the loss of consortium of Plaintiffs.

123.   It was foreseeable that these reckless and negligent acts and omissions by the Defendant would result in the death of Charles Holbrook and loss of consortium suffered by Plaintiffs.

124.   Defendants reckless and negligent acts and omissions contributed to cause the wrongful death of Charles Holbrook, including those damages in paragraph 119, and loss of consortium suffered by Plaintiffs.

**COUNT III**

**<u>LOSS OF CONSORTIUM OF BELEN A. HOLBROOK</u>**

All previous paragraphs are incorporated herein by reference.

125.   Belen A. Holbrook and Charles W. Holbrook were married on July 4, 1994 and remained married until Charles Holbrook's death.

126.    Belen Holbrook and Charles Holbrook lived together at the time of his death.

127.    Belen Holbrook and Charles Holbrook shared a close, loving, and supportive, spousal relationship.

128.    Charles Holbrook provided Belen Holbrook with love, companionship, affection, society, and moral support.

129.    It was foreseeable that Belen Holbrook would be harmed by the death of her husband as a result of the negligent acts of the Defendants.

130.    Belen Holbrook was harmed by the wrongful death of her husband as a result of the negligent acts of the Defendants.

131.    Defendants' negligence was a direct and proximate cause of Belen Holbrook's loss of spousal consortium.

## COUNT V

### LOSS OF CONSORITUM OF ALYSSA HOLBROOK

All previous paragraphs are incorporated herein by reference.

132.    Alyssa Holbrook is the minor child of Charles Holbrook and was living with Charles Holbrook at the time of his death.

133.    Alyssa Holbrook and Charles Holbrook shared a close, loving, and supportive father-daughter relationship.

134.    Charles Holbrook provided love, society, guidance, and counseling to Alyssa Holbrook.

135.    It was foreseeable that Alyssa Holbrook would be harmed by the wrongful death of her father as a result of the negligent acts of the Defendants.

136.     Alyssa Holbrook was harmed by the wrongful death of her father as a result of the negligent acts of the Defendants.

137.     Defendants' negligence was a direct and proximate cause of Alyssa Holbrook's loss of parental consortium.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Belen Holbrook, individually, as next friend of Alyssa Holbrook, and as personal representative of the wrongful death claims, requests that judgment be entered in favor of Plaintiffs and against Defendant for compensatory damages in the amount of $24,633,042.13, costs of suit, pre and post-judgment interest, and such other relief as the Court deems just and proper.

Dated: January 30, 2020                              Respectfully submitted by:



                                                  **/s/ Randi McGinn**
                                                  Randi McGinn
                                                  Jamison Shekter
                                                  201 Broadway Blvd. SE
                                                  Albuquerque, NM  87102
                                                  p: (505) 843-6161
                                                  f: (505) 242-8227
                                                  Randi@McGinnLaw.com
                                                  Jamison@McGinnLaw.com

                                                  *Attorneys for Plaintiff*